UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:07-CR-157 |
| ) | (Phillips / Shirley) |
| JOSEPH DEJON MANNING, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case came before the Court on March 31, 2008, for an evidentiary hearing on Defendant Joseph Manning's Motion to Suppress [Doc. 45]. Attorney Kim Tollison appeared with Titus Stigall. Attorney Ursula Bailey was present on behalf of Amanda Stigall, who was previously excused form the hearing. Attorney Steven Shope was present with defendant Joseph Manning. Attorney Kelly Johnson and his client, Ajakibiani McBayne, were previously excused from the hearing. Assistant United States Attorney Matthew Morris was present on behalf of the government.

The Court received the testimony of two witnesses at the evidentiary hearing: Russell Wallace, one of two Secret Service agents who investigated this case; and Joseph Manning, the defendant. The facts before the Court are largely undisputed; the parties disagree on the application of law to the events. In brief, Mr. Manning seeks to bar the government's use of a statement given to law enforcement as evidence at trial, asserting it was taken in violation of the protections afforded

by Miranda v. Arizona, 384 U.S. 436 (1966) and its progeny. The United States argues that the statement was not subject to the requirements of Miranda. The government filed a responsive and supplemental brief on April 3, 2008 at [Doc. 65], and the Court took this matter under advisement April 4, 2008. The relative positions and arguments of the parties are set forth more fully below.

**I: FACTS**

**A.     Russell Wallace**

*1.) Direct Examination*

Russell Wallace had been a special agent with the United States Secret Service for just over five years when he was assigned to investigate a report of counterfeit U.S. currency tendered at an Oak Ridge discount store. A supervisor gave Wallace the counterfeit money along with contact information for the store. [Tr. 8]. Meanwhile, another Secret Service special agent, Brian Northcutt, was investigating a report from a local rental agency that a rented computer had been returned with images of U.S. currency on it. [Tr. 8]. Wallace became aware of Northcutt's investigation and, when compared, the imaged notes and the fake currency matched.[1]

Thereafter, Wallace and Northcutt went to the discount store to interview the cashier who had accepted the notes. Wallace and Northcutt learned the cashier had since been fired from the store, so they instead interviewed store security personnel. From this interview, Wallace got a description of the person who passed the fake currency, who was described as, "an attractive black female with blue eyes" who was with "a black male who had long hair and several tattoos." [Tr. 9].

Further investigation at the rental company turned up a copy of the driver license for the person who had rented the computer. The driver license photograph matched the female subject's

---
[1] Wallace also testified that all the counterfeit notes had the same serial number, which was the same as was found on the computer image.

description given by the store security; this person was later identified as Ajakibiani McBayne. [Tr. 9]. The license gave McBayne's home address as 5009 Ivy Rose Lane in Knoxville. [Tr. 10].

Afterward, the two agents drove to 5009 Ivy Rose Lane and knocked on the front door. [Tr. 10]. Wallace testified that he and Northcutt were dressed in suits and, although the agents were armed, their firearms were covered by their suit jackets. [Tr. 11]. Wallace and Northcutt knocked at the front door and rang the doorbell, but when no one answered they walked "back around to the drive, the driveway area." [Tr. 10]. The garage door for 5009 Ivy Rose Lane was on the side of the house. While Wallace and Northcutt stood in the driveway talking, a door leading from the garage to the interior of the house opened and Joseph Manning stepped out. [Tr. 10]. Manning matched the description of the male seen with McBayne at the store. As Wallace described, "so, obviously, we went up to the door and spoke with Mr. Manning." [Tr. 11]. The agents told Manning who they were and showed him their identification.[2]

They explained their purpose and asked if they could come into the house and talk with him. [Tr. 11]. Manning "said yes and allowed us into the - we went into the kitchen area of the residence." [Tr. 11].

Once inside the kitchen, Wallace and Northcutt started explaining, with more detail, their reason for coming to the house. [Tr. 11]. Wallace recalled that Manning "pulled out a jug of tea and poured himself a glass of tea while we were speaking." [Tr. 12]. Manning told the agents that there was more to the story, that they did not know all the story behind their investigation. [Tr. 12]. The agents told Manning they were trying to find out what had happened and how it happened. Wallace testified that Manning's mother came into the area. Manning told her that "I'm just going to talk

---

[2]Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. Florida v. Royer, 460 U.S. 491, 497 (1983)

-3-

to these guys, Mom, don't worry about it." [Tr. 12].

Manning then suggested to the agents that they continue the conversation outside on an open wooden deck on the rear of the house, to which they assented. [Tr. 12 - 13]. Before going outside, Manning wanted to put on a shirt, which was upstairs. [Tr. 13]. Wallace testified that he asked Manning, "Do you care if I go with you?" [Tr. 13]. Manning said he did not care, so Wallace followed Manning upstairs, Manning got a shirt, they came back down and went out onto the deck, along with Northcutt. [Tr. 13]. Wallace testified that he accompanied Manning upstairs to get the shirt for officer safety purposes and to prevent the destruction of any evidence that might be in that part of the house. [Tr. 13]. As they went, Wallace asked Manning whether there were any firearms upstairs. Manning responded there were no guns in the house because he was not allowed to have guns as a convicted felon. [Tr. 13].

After a shirt was retrieved, Manning, Wallace and Northcutt took seats outside on the deck and resumed their earlier discussion about the counterfeit currency investigation. [Tr. 14]. Manning wanted to telephone his probation officer to report the contact with law enforcement and the agents agreed, "yeah, absolutely, you probably should." [Tr. 14]. Manning called from a telephone on the deck and left a message for the probation officer. [Tr. 14]. During the interaction on the deck, Wallace asked Manning if he could photograph Manning's tattoos. [Tr. 14]. Manning agreed, so Wallace walked down a set of steps leading from the deck and back to the driveway to retrieve his camera from the agents' car. [Tr. 14]. Wallace returned with the camera and took pictures of Manning's tattoos. Northcutt remained with Manning.

During this time, Wallace asked Manning about McBayne. The agents told Manning they knew McBayne had rented a computer and asked if he knew where the agents could reach McBayne. [Tr. 14-15]. Manning offered to call McBayne and "have her come over." [Tr. 15]. The agents

responded that this would be very convenient for them and asked him to go ahead and call. Manning telephoned McBayne and, a short time later, she arrived, along with a small child [Tr. 15]. While they waited for McBayne to arrive, the agents and Manning went back inside the house because it was a warm sunny day. [Tr. 15]. It was inside, at the breakfast table, that the agents interviewed McBayne. [Tr. 15]. Wallace testified that at no time during the interview did he indicate to Manning or to McBayne that they were not free to leave. [Tr. 15]. In fact, while the three were still outside on the deck, Manning remarked that he did not want to return to jail and Northcutt replied that the agents were "still in the process of investigation," and that "nobody's under arrest yet." [Tr. 15-16]. Wallace testified that when the agents left the house, they told Manning they were going to continue their investigation and that, "very likely we may be back to talk to him again, we may have more questions." [Tr. 16].

*2.) Cross Examination*

Upon cross-examination by Attorney Shope, Wallace testified that he already had the description of a male suspect with long hair and tattoos when he went to 5009 Ivy Rose Lane on that day. [Tr. 16]. Immediately upon seeing Manning, with long hair and tattoos present at that address, Wallace believed he might be one of the suspects in the investigation. [Tr. 17]. Wallace testified that after his initial contact with Manning, Manning was never left alone until the agents departed. [Tr. 17 - 18]. Wallace testified that, in his opinion, Manning could have left at any time or told the agents to leave at any time. [Tr. 18]. Manning also testified that the agents made no written or tape-recorded record of Manning's statement, although the Secret Service possesses the means to do so. [Tr. 18-19]. At the conclusion of Wallace's testimony, the United States rested it proof.

### B.     Joseph Manning

   *1.) Direct Examination*

After prior consultation with his attorney and admonition by the Court of his right to remain silent, Defendant Joseph Manning testified in support of his motion. At the time of these events, Manning lived at 5009 Ivy Rose Drive with his mother, stepfather and Manning's daughter. [Tr. 21]. Manning was in bed when the agents first came to the house. [Tr. 21]. Manning first saw the agents when, "I was just wondering who it was, and I opened the garage real quick and saw their feet or whatever as the garage door was going up." [Tr. 21]. When Manning lifted the garage door up, the agents walked over toward it. Have just been in bed, Manning was wearing "basketball shorts" and no shirt. [Tr. 21]. Manning confirmed that he does have some tattoos and that they were visible to the agents and also that his hair was as long as at the time of the hearing (which was at or near the middle of his back, from the Court's observation). [Tr. 21 - 22].

From the tone of Manning's testimony, he was not pleasantly surprised to find police at the garage door, but he nonetheless invited them into the house. Manning testified that the agents showed their badges and asked if they could come inside to talk to him. Manning assented, "I'm like - you know what I'm saying - sure, come on." [Tr. 22]. Wallace described his interaction with the agents as them "talking" together once inside. [Tr. 22]. Manning recalled that when the agents wanted to speak with McBayne, he offered to call her so that the officers would not go to her workplace or house. [Tr. 22]. Manning agreed with Wallace's testimony with respect to the two of them going upstairs to get the shirt. [Tr. 22]. While the three were outside on the deck, the agents asked Manning for his driver license. [Tr. 22]. Manning retrieved it from a dresser upstairs, but Northcutt accompanied him. [Tr. 23]. Manning was never allowed to be out of the presence of one of the agents from the time they first made contact until they left. [Tr. 23]. Manning testified that

he did not feel free to leave during this time. [Tr. 23]. When asked whether he felt as if he were under arrest, Manning described, "I felt like I could have been, yes, basically, might as well, or in some type of custody at least." [Tr. 23]. The agents did not advise Manning of his right to remain silent. [Tr. 23]. Manning stated that he asked permission before telephoning his probation officer. [Tr. 23]. Manning testified that he asked the agents before he made the call because he, in part, felt some uncertainty whether it was necessary to ask the agents, explaining that:

> Well, yeah. But, I mean, it's my house, too. I mean, I can - I'm sure I can call, but it's like when I reach for the phone, it was 'What are you doing?' you know what I mean, like, hold up, you can't be making no quick moves like that; you know what I mean? I was like, well, I need to call my P.O., you know, so they'll know I'm talking to you all. It's part of my - you know what I'm saying - what I'm supposed to do when I'm out here.
>
> [Tr. 24].

Manning stated that he felt his movements were somewhat circumscribed as he moved about his house, as follows:

> Q. And that added to your feelings that you weren't free to do what you wanted to do?
>
> A. That, and more of, when I was trying to go anywhere, it was like don't go too fast; you know what I mean? When you're going up the steps, you can't - don't walk too fast; you go in a room, hold up, slow up, let me get by you.
>
> Q. They told you to hold up, slow up?
>
> A. Yeah. It was like slow down, moving too fast.
>
> [Tr. 25].

Manning's impression was that Northcutt was more "laid back" than Wallace. [Tr. 25].

-7-

*2.) Cross Examination*

Upon cross examination by AUSA Morris, Manning testified that while his mother was not at home when the agents first arrived, she came home for lunch while they were there. [Tr. 25]. The only child present at the house while the agents were there was Manning's young son, who arrived with McBayne. [Tr. 25]. Manning stated that he has been arrested in the past, but testified that he was not advised of his rights at the time of that earlier arrest. [Tr. 25-26]. Manning confirmed that he was arrested for armed robbery of a bank, was convicted of that crime and served time in a federal prison as a result. [Tr. 26].

At the conclusion of Manning's testimony, the defense rested its proof. The United States did not offer any rebuttal evidence.

## II: POSITIONS OF THE PARTIES

**A.     Defendant**

Manning challenges the use of statements made to the agents that day as evidence in the government's case-in-chief at trial. Manning argues that any incriminating statements made to Wallace and Northcutt were elicited in violation of <u>Miranda</u>. Manning complains that in the absence of the familiar <u>Miranda</u> warning, his statements to the agents should be suppressed. Manning argues that he "was the target of the investigation and was questioned at length and felt that he was not free to leave and thus the alleged statement should be suppressed." [Doc. 45 at 1]. Although he was not arrested by the agents that day, Manning asserts that the statements were made while he was effectively "in custody," and thus subject to <u>Miranda</u>, citing <u>United States v. Macklin</u>, 900 F.2d 948, 950-51 (6th Cir.1990).

Manning argues that he because was certainly a target of the investigation from the time agents saw him in the garage, his interaction with them was more like a custodial interrogation than

a knock-and-talk encounter. Manning matched the distinctive physical description of one of the suspects and was at a location associated with another suspect with whom he was reportedly observed during the commission of the offense. Attorney Shope argues that the Court should afford weight to these facts in determining whether Manning was actually in custody, citing Escobedo v. Illinois, 378 U.S. 478 (1964).

Manning argues that he did not believe he was free to leave or terminate contact with the agents. In support of this position, the defense argues that the agents never left Manning alone at any point after they made initial contact, even following him upstairs to his bedroom to retrieve a shirt, and later his driver license. Manning argues that his restricted movement and actions are also evinced by the fact that he asked permission to make a telephone call to his probation officer. Manning asks the Court to conclude that he was effectively in custody, and argues that the agents were obliged to advise him of his Miranda rights before questioning him about the offense and that they did not.

**B.     Government**

The United States agrees that the agents did not advise Manning of his Miranda rights, but argues that they were not necessary under these circumstances. The government describes the events as a consensual encounter between the officers and Manning and that Manning was free to terminate the conversation at any time. The government states that the agents never displayed their handcuffs or their sidearms nor did they make any other showing of authority that could reasonably have been interpreted as coercive. The prosecution relies on several facts to illustrate the consensual nature of the encounter, to include: Manning was allowed to make a telephone call to his probation officer in the middle of the conversation, Manning felt free to pour himself a glass of ice tea while they were talking, the agents relocated the interview to the outside deck at Manning's request,

Manning assented to photographs of his tattoos and Manning telephones McBayne to come over for an interview with the agents. The government also draws the Court attention to a logical event that *did not* occur: a young child was at the house during the latter part of the interview and the agents at no time suggested that Manning's mother might want to remain nearby to care for the child, as might be expected if Manning or McBayne were either in custody or at imminent risk of arrest. The Court also notes Manning invited the officers into the house, and advised his mother that he would be talking to the agents and that she need not worry about anything. The Court also notes the agents left that day without arresting Manning.

The government relies upon California v. Beheler, 463 U.S. 1121, 1125 (1983), and United States v. Salvo, F.3d 943, 948 (6th Cir. 1998) and urges the Court to consider a totality of the circumstances to determine "how a reasonable man in the suspect's position would have understood the situation." The government argues that under these circumstances, it would not have been reasonable for Manning to conclude that he was not free to terminate the conversation, ask the agents to leave or leave himself. The government further argues that the factors set forth in United States v. Crossley, 224 F.3d 847, 861 (6th Cir. 2000) all weigh in favor of the government's position. The United States argues that Miranda was simply not warranted under the circumstances and there is no basis for suppression of Manning's statement.

### III: ANALYSIS

*A. Initial Approach by the Agents*

Not all encounters between the police and citizens are seizures within the meaning of the Fourth Amendment. For instance, there is nothing preventing the police from knocking on a home's door and questioning a suspect or an individual with information about an investigation. See, e.g., United States v. Thomas, F.3d 274, 277 (6th Cir.2005) (citing, among others, Ewolski v. City of

Brunswick, 287 F.3d 492, 504-05 (6th Cir.2002) (approving of "knock and talk" investigations)). "No seizure occurs when police ask questions of [an] individual, ask to examine the individual's identification ... as long as the officers do not convey a message that compliance with their requests is required." United States v. Peters, 194 F.3d 692, 698 (6th Cir.1999) (quoting Florida v. Bostick, 501 U.S. 429, 435 (1991). The initial approach of the agents to Manning's house to speak with him about their investigation was lawful and did not operate to seize Manning.

### B. *Miranda v. Arizona*, 384 U.S. 436 (1966)

A defendant may not be "compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966) requires that a suspect subject to custodial interrogation must first be given notice of his right against self-incrimination. Statements obtained during custodial interrogation in violation of Miranda may not be admitted as evidence in the government's case-in-chief at trial. Miranda, 384 U.S. at 479.

However, the obligation to administer a Miranda warning to a suspect is not required during the course of all police contact, it only arises "where there has been such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495(1977); accord United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003). Miranda warnings are required before custodial interrogation, the Miranda court defined "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444.

### C. Was Manning in Custody?

The parties agree that Manning was not under formal arrest. However, they dispute whether the circumstances constituted the functional equivalent. The test for determining whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances,

-11-

the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984);United States v. Knox, 839 F.2d 285, 291 (6th Cir.1988) ("The "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.")(quoting California v. Beheler, 463 U.S. 1121, 1125(1983) (per curiam)).

In determining whether Manning was subject to custodial interrogation the Court must look to the totality of the circumstances "to determine 'how a reasonable man in the suspect's position would have understood the situation.' " Salvo, 133 F.3d at 948; United States v. Phillip, 948 F.2d 241, 247 (6th Cir.1991), cert. denied, 504 U.S. 930 (1992)). The testimony of all three witnesses regarding the circumstances of the interview are substantially the same. The Court will consider these facts within the context of the Sixth Circuit's factors set forth in United States v. Salvo, 133 F.3d 943, 950 (6th Cir. 1998) and United States v. Swanson, 341 F.3d 524, 528 -529 (6th Cir. 2003) to determine whether Manning was subject to the functional equivalent of arrest, and therefore in custody, at the time the statements were made. The initial focus of the Court's consideration must be on whether the agents' conduct was "such a show of authority that [the] Defendant reasonably believed he had no choice but to comply." United States v. Saari, 272 F.3d 804, 809 (6th Cir.2001). The agents first came to Manning's residence on a classic "knock and talk," in hopes of speaking with McBayne, who had given that address, about the counterfeit bills. "Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers ... reasonably suspect criminal activity." United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001) (collecting cases); see also Ewolski v. City of Brunswick, 287 F.3d 492, 504-05 (6th Cir. 2002) (citing this passage from Jones with approval). Manning then came into view and the agents asked permission to come inside to talk. Manning testified that after they showed him their identification,

he then invited them into his house. [Tr. 22]. From that point, Manning was in the company of at least on of the agents until they departed. Wallace testified that this was for the purpose of safety and to prevent the destruction of any evidence that might be in other parts of the house. [Tr. 13]. Both Wallace and Manning testified that the agent asked to come along with Manning, who permitted him to do so. [Tr. 13, 17, 23]. Although Manning testified that he felt he was "in some type of custody at least" [Tr. 23], the evidence shows that Manning acted in a manner more consistent with one who feels free to move about his home than one who perceives a level of restraint ordinarily associated with arrest. Manning prepared himself a beverage from the refrigerator, moved the interview to the outside deck (apparently for privacy from his mother), telephoned his probation officer and McBayne, went upstairs to get a shirt and again to retrieve his driver license. Moreover, the agents specifically told Manning that he was not under arrest, that the purpose of the contact on that date was investigation and to seek his statement about the events. [Tr. 16, 18]. Wallace presented uncontradicted testimony that at the start of the discussion Manning told the agents "there's more to the story ... you don't know all the story." [Tr. 12]. This comment is consistent with an attitude of willingness to speak further about the subject of the questioning, to tell the rest of the story.

The circumstances were not those associated with an arrest. Manning's movement was observed but not restricted, the agents did not pat him down, only later in the interview did the agents ask to see Manning's identification, and the agents did not make any effort to provide for the caretaking of the child. The Court finds that the agents did nothing to suggest Manning was in custody and it would not have been reasonable for him to conclude he was in custody.

Next, consideration is given to the purpose of the questioning. The purpose of the questioning here was to gather information about the counterfeit currency investigation and obtain

statements from those persons suspected of involvement. The Court finds this factor weighs in favor of the defendant's position, as the purpose of the questioning was to obtain Manning's statement, and he was a suspect in the reported crime. The weight given to this factor must be slight, however. As earlier observed, the knock and talk method of investigation has been approved by the Sixth Circuit. The agents made clear there purpose and there is no suggestion that they attempted to gain a statement through subterfuge or threats.

The Court must also consider "whether the place of the questioning was hostile or coercive." Salvo, 133 F.3d at 951 (parking lot of a fast-food restaurant is a non-coercive location); Swanson, 341 F.3d at 529 (location outside of a shop is non-coercive). This factor weighs heavily in favor of the government's position as the questioning took place in Manning's own home. It was certainly not a hostile place and the Court has already concluded the agents did not create a coercive environment.

The length of the questioning must also be taken into account. Here, no evidence was offered as to the length of the interview, but no suggestion has been made that its length was of any significance. Accordingly, the Court finds the length of the interview was reasonable and this factor weighs in favor of the government.

The Court must assess whether there were "other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so." Salvo, 133 F.3d at 950. In Manning's case, it appears the only remark made to this effect was in response to Manning's lament that he did not want to go back to jail, a reasonable comment from a person on probation. Wallace gave his assurance that no one was going to jail that day and that the agents were merely investigating at that point. The non-verbal indicia likewise suggested that the questioning was voluntary and that Manning was free to ask the

agents to leave. First, the agents approached Manning in what was possibly the least coercive way they could have done so by walking up to him as he opened the garage door. They did not display their handcuffs and their firearms were worn under their suit jackets. They asked, not demanded, to come inside and extended the courtesy of showing identification before doing so, as they were not in police uniforms. They made no threats to get a search warrant or arrest warrant if Manning refused. In fact, Wallace testified that during the interview, the agents grew uncomfortably hot on the deck because they wore their suit jackets, which served the purpose of concealing their firearms worn underneath. Manning's movements about his house, interaction with his mother, direction of the group to the deck, permitting his tattoos to be photographed and his offer to call McBayne and ask that she come over to also be interviewed, all demonstrate that everyone involved in the questioning understood the matter was voluntary and the agents were in the house only by Manning's permission. The Court finds that there were no other "other indicia of custody" and that all other indicia indicate that Manning understood the questioning was voluntary and that he was free to ask the officers to leave. The Court finds that this factor weighs in favor of the government's position.

Finally, the Court must consider "whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police." Salvo, 133 F.3d at 950. The agents did not put their hands on Manning, did not handcuff him, they did not direct him to stay in a certain area, or otherwise restrain his movement during questioning. The fact that the agents stayed with Manning as he went upstairs for his shirt and driver license does not outweigh the overwhelming indicia of a voluntary and non-coercive atmosphere. Wallace's testimony established the agent's independent motive in staying with Manning: to see that evidence

was not destroyed and for the safety of the officers who had just entered a house about which they had limited information. This factor also weighs in favor of the government's position.

Here, the facts and circumstances are such that a reasonable person would not have considered himself "in custody," requiring the Miranda warning.

The Court is cognizant that the presence of the agents may have been unpleasant to Manning and may have caused him dismay and nervousness, reactions which are not uncommon when citizens meet the police. See e.g., Illinois v. Wardlow, 528 U.S. 119, 131 (2000) (recognizing belief "that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence"); Alberty v. United States, 162 U.S. 499, 511 (1896) (citizens have all manner of reasons to prefer to avoid contact with police); United States v. Richardson, 385 F.3d 625, 630-31 (6th Cir. 2004) (holding that nervousness is "an unreliable indicator" of illegal activity, because many citizens become nervous when stopped by police "even when they have nothing to fear or hide"); United States v. Erwin, 71 F.3d 218, 221 (6th Cir. 1995) rev'd on other grounds (not unusual for man to be sweating and nervous when stopped by police in summer); United States v. Andrews, 600 F.2d 563, 566 (6th Cir. 1979) (refusing to consider nervousness in the reasonable-suspicion calculation because nervousness is entirely consistent with innocent behavior among travelers, and holding that, without additional evidence of wrongdoing, nervousness is entitled to no weight); United States v. Urrieta, 8 WL 731224, 8 (6th Cir. 2008) (nervousness upon contact with police officer inherently *unsuspicious*). The fact that Manning may have preferred not to have any contact with the agents is not unique to this case. Because courts so consistently view this as a possible reaction to contact with police, unless Manning declined their invitation to talk or asked the agents to leave an uncomfortable feeling about their presence, without more, does not enter into this equation. Whether an individual was in custody, for purposes of Miranda, depends on the

objective circumstances of the interrogation, not on subjective views harbored by either the interrogating officers or the person being questioned. Stansbury v. California, 511 U.S. 318 (1994).

*D. Application of Escobedo v. Illinois, 378 U.S. 478 (1964)*

Manning argues that because he was one of the suspects identified at the store, the agents had focused on him as a suspect as soon as they saw him in the garage. The United States agrees that when the agents found a black male with long hair and tattoos at the address given by McBayne, they suspected he was involved in the counterfeiting activity. Manning argues that "where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect," the Court's consideration of the circumstances should be weighted in favor of the defendant's position that he was effectively in custody. Escobedo v. Illinois, 378 U.S. 478, 490-491 (1964).

In Miranda the Supreme Court limited the requirement of warnings to those situations involving "custodial interrogation." The Court elaborated on that limitation by stating: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. The Miranda Court indicated in a footnote that the concept of "custodial interrogation" was what it intended in Escobedo when it set restrictions on questioning out of the presence of retained counsel after the investigation of the police had "focused" on the suspect. Miranda, 384 U.S. at fn. 4.

The Supreme Court had addressed the argument set forth by Manning in Beckwith v. United States, 425 U.S. 341 (1976). In Beckwith, the defendant, without being advised of his Miranda rights, made incriminating statements to government agents during an interview in a private home.

-17-

Beckwith later asked that Miranda "be extended to cover interrogation in non-custodial circumstances after a police investigation has focused on the suspect." Beckwith, 425 U.S. at 345. The Supreme Court found his argument unpersuasive, explaining that it "was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the Miranda requirements with regard to custodial questioning." Beckwith, 425 U.S. at 346-347. The court concluded that the defendant was not entitled to Miranda warnings: "Although the 'focus' of an investigation may indeed have been on Beckwith at the time of the interview ..., he hardly found himself in the custodial situation described by the Miranda Court as the basis for its holding." Beckwith, 425 U.S., at 347; see also Stansbury v. California, 511 U.S. 318, 323 (1994).

While the focus of suspicion is no longer the touchstone, if an investigation has focused on one suspect, the Court agrees that a set of ambiguous circumstances may be interpreted as creating a custodial environment. Here, the Court is not presented with ambiguous circumstances, however. As set forth above, the interview took place in Manning's own home, in the afternoon, after agents identified themselves and asked to come inside. Manning invited them inside, moved about his house as the interview went on, prepared a drink, retrieved a shirt and directed the conversation to an outside area. Manning telephoned his probation officer and, later, called McBayne to come over to the house and meet with the agents, too. These circumstances could not be interpreted as ambiguous. The Court finds that Manning had become a suspect of the investigation and when the agents first saw him, they focused on him as a potential conspirator in the counterfeiting activity. This fact does not convert and otherwise non-custodial, wholly consensual knock and talk interview into a custodial interrogation. Escobedo v. Illinois, 378 U.S. 478 (1964) was expressly limited by the Supreme Court in Miranda to application in this context and does not operate independently of

the requirement that a suspect be in custody, or its functional equivalent, before police are require to advise him of Miranda.

The Court finds that "the undisputed facts of this case establish that there is simply no indicia of a custodial interrogation," no its functional equivalent. United States v. Salvo, 133 F.3d 943, 950 (6th Cir. 1998). The Court further finds that under the totality of the circumstances Manning's freedom of action was not curtailed to a degree associated with a formal arrest. See, Berkemer v. McCarty, 468 U.S. 420, 440 (1984). For that reason, the agents were under no duty to advise Manning of his Miranda rights. Finding no Constitutional violation, the Court does not conclude there is a basis for suppression of Manning's statement at trial.

### IV: CONCLUSION

For the reasons stated herein, the Court's recommendation is that Defendant Joseph Manning's Motion to Suppress **[Doc. 45]** be **DENIED**.[3]

                                                     Respectfully submitted,

                                                       s/ C. Clifford Shirley, Jr.
                                                   United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).